Carole Ann BURGESS, Appellant,

v.

Larry Lee BURGESS, Appellee.

No. S–532.

Supreme Court of Alaska.

Dec. 6, 1985.

Sema E. Lederman, Groh, Eggers & Price, Anchorage, for appellant.

William J. Moran, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION

BURKE, Justice.

This appeal concerns the trial court's division of the parties' property in a divorce decree.

Carole and Larry Burgess were married in June, 1969. They lived together in a house on Primrose Street, in Anchorage, until Carole moved out permanently in September, 1980. No children were born of the marriage, but Carole and Larry both have children from previous marriages.

In 1964, Larry and a former spouse bought the Primrose Street house for $28,499.28. The purchase was made through two notes, a primary note for $27,000 and a side note for $1500. At trial the parties stipulated that by the time Larry and Carole married, the original note had decreased to $24,300, and Larry had accrued $2700 in equity.[1] At the time of divorce the value of the house was $110,000, the remaining balance on the mortgage was $13,982, and the equity equalled $96,018.

Carole and Larry lived together in the Primrose Street residence for eleven years. Although the property remained solely in Larry's name, both Carole and Larry contributed from their salaries to mortgage payments. Both actively participated in the property's management and maintenance.

Approximately seven weeks after Carole and Larry separated, Carole signed a quitclaim deed assigning to Larry all interest in the Primrose Street property. Carole maintains that, on the advice of Larry's attorney, she signed the documents solely to evidence her lack of substantial property and thus discourage an impending lawsuit. She testified that Larry told her that the instrument would not affect their settlement on the divorce, and that she would still receive her share of the property. While Larry agreed that the document was executed to protect the property from a

---

1. The parties dispute the amount of equity in the property at the time of marriage. Carole contends it is $2700 ($27,000 note – $24,300 still owed) Larry maintains it is $4200 ($27,000 note + $1500 side note – $24,300 still owed). We rely on the $2700 figure because nothing in the record indicates that the $1500 side note has been paid yet.

possible lawsuit, he testified that the quitclaim also expressed the parties' oral agreement for a property division.

After entering a Partial Decree of Divorce, the superior court determined that the Primrose Street residence was Larry's premarital asset, and that he was entitled to retain the entire equity of $96,018. The personal property was divided so that Carole's share totalled $16,575[2] and Larry's totalled $10,774. The court also awarded Carole one-half of the present worth of the difference between the parties' retirement benefits and ordered Larry to contribute $1500 towards Carole's attorney's fees and costs.

■ While the trial court has broad discretion to divide property in a divorce proceeding, AS 25.24.160(6), "[i]n limited circumstances invasion of one spouse's property acquired before coverture may be required as a matter of law." *Wanberg v. Wanberg*, 664 P.2d 568, 571 (Alaska 1983) (footnote omitted). One such circumstance arises when the parties demonstrate their intent to treat certain premarital property as joint property, *e.g.*, when both spouses have taken an active interest in the ongoing maintenance, management and control of specific assets. *Id.*[3]

In *Wanberg* we held that the entire equitable value of a lot was subject to distribution, even though John Wanberg owned the property before the marriage. We explained:

> The Wanbergs consistently combined their efforts in improving and managing the property, and used the building as

their joint personal residence for nearly two years. Although Dianne's name never appeared on the title to the Grandview lot, she signed jointly with John when a permanent $120,000 loan was taken against the property. Under these circumstances, we hold that it was an abuse of discretion for the trial court to shield the property from equitable distribution merely by affixing to the property the label of "pre-marital asset."

664 P.2d at 572. We also characterized another of John's premarital properties as a marital asset. This commercial property served as the Wanberg's residence for most of their five year marriage. Diane played an important role in the ongoing business affairs of the property, and she contributed towards maintenance and improvements on it. *Id.* at 573.

■ Two common factors characterize the properties involved in the *Wanberg* case—(1) the use of the properties as the parties' joint personal residences, and (2) the active interest taken by both parties in the ongoing management and maintenance of the properties. In the case at bar, these factors are also present. Larry and Carole used the Primrose property as their joint personal residence for eleven years. Carole managed the couple's books and finances, including transactions regarding the property. Loan and maintenance payments were made from the couple's joint checking account, to which they both contributed.[4] Thus, we conclude that the trial court erred in characterizing the Primrose Street property as Larry's separate asset. The value of the equity accumulated during

---

2. The trial court miscalculated the amount at $15,975.

3. Even if the parties had no intent to treat property as a joint asset, AS 25.24.160(6) provides that a court "may invade the property of either spouse acquired before marriage when the balancing of the equities between the parties requires it...." In *Vanover v. Vanover*, 496 P.2d 644 (Alaska 1972), we held that where one spouse's contributions to the marital community, pecuniary or otherwise, have benefitted the other spouse's pre-coverture property, the trial court *may* include such property in the pool of marital assets for a just and equitable property

division. *See also Rosson v. Rosson*, 635 P.2d 469 (Alaska 1981); *Hager v. Hager*, 553 P.2d 919 (Alaska 1976); *Burrell v. Burrell*, 537 P.2d 1 (Alaska 1975); *Moore v. Moore*, 499 P.2d 300 (Alaska 1972).

4. Carole's name did not appear on the loan. A joint loan, however, is not required to show that the parties intended to treat the property as a joint asset. In *Wanberg*, the parties had a joint loan on the Grandview Heights lot, but not on the Gambell Street property. Nevertheless, both were characterized as joint assets. 664 P.2d at 571–73.

the marriage was a marital asset and should have been treated as such. On remand, the value of this equity should be divided between the parties,[5] with a possible offset of $8200 for Larry's improvements to the property since the separation.[6]

■■■ The existence of the quitclaim deed does not change this result because the deed is fraudulent and the product of undue influence.[7] In marital relationships a transaction in which one spouse gains an advantage over the other is presumptively fraudulent. *Trujillo v. Padilla,* 79 N.M. 245, 442 P.2d 203, 206 (1968) (warranty deed conveyed by the wife to the husband prior to divorce set aside). To overcome this presumption, the spouse gaining the advantage must show: (a) payment of adequate consideration; (b) full disclosure to the other spouse of his or her rights and the value of the property; and (c) that the spouse conferring the benefits has competent and independent advice. *Id.* Moreover, a fraud is committed when one spouse, without consideration, transfers property to the other in order to place the property beyond the reach of creditors. *Jayhawk Equipment Co. v. Mentzer,* 193 Kan. 505, 394 P.2d 37, 41 (1964).

The parties agree that the deed was signed to create the appearance that Carole had no substantial holdings and thus deter a potential lawsuit. The existence of fraud is reinforced by the payment from Larry to Carole of a mere $10 for quitclaiming property worth $110,000. Carole executed the deed under the advice of Larry's attorney and without independent counsel. She claims she understood that the deed would not impact their property settlement. When asked whether it was agreed that he would reconvey the property if the threatened lawsuit were not filed, Larry responded: "We said we should work out something." Despite this statement, Larry still maintains the quitclaim deed reflected their oral agreement for the division of property.

The trial court abused its discretion in considering the existence of this quitclaim deed as a factor in characterizing the property subject to distribution. The quitclaim deed represents nothing more than the parties' efforts to prevent a possible lawsuit.

■■■ The division of marital assets in a divorce proceeding is governed by the application of the factors announced in *Merrill v. Merrill,* 368 P.2d 546 (Alaska 1962).[8] In its Findings of Fact and Conclusions of Law, the trial court listed the following factors as influencing its decision: (1) the parties' ages; (2) the parties' earnings; (3) Larry's acquisition of the Primrose Street property before his marriage to Carole and his retention of sole title; (4) the parties' use of the property as their family residence for eleven years; (5) Larry's support of Carole's children from a prior marriage;

**5.** The division need not be equal to be equitable. *Rostel v. Rostel,* 622 P.2d 429, 432 (Alaska 1981); *Hurn v. Hurn,* 541 P.2d 360, 360 (Alaska 1975). As a starting point, equality is presumptively equitable. *Wanberg,* 664 P.2d at 574–75.

**6.** Larry personally built cabinets and performed other carpentry. The record does not describe the source of the materials used. On remand, the court should consider whether in making the improvements, Larry invaded property which should have been divided. *See Hunt v. Hunt,* 698 P.2d 1168, 1171–72 (Alaska 1985). Absent such an invasion, Larry should receive an offset for the full value of the post separation improvements.

**7.** Carole's explicit allegation of undue influence was first made in her reply brief. While this contention was not specifically set forth in the Points on Appeal as required by Appellate Rule 210(e), the undue influence issue was encompassed in Point #15—that the superior court erred in relying on the quitclaim in making an equitable division of the marital property. *See Wetzler v. Wetzler,* 570 P.2d 741, 742 n. 2. (Alaska 1977). Moreover, the issue was implicitly raised in Carole's opening brief. *Cf. Hitt v. J.B. Coghill, Inc.,* 641 P.2d 211, 213 n. 4 (Alaska 1982) (points on appeal waived when argued only in reply brief).

**8.** *Merrill* enunciated the principal factors in property division: (1) respective ages of the parties; (2) earning ability; (3) duration and conduct of each during the marriage; (4) station in life; (5) circumstances and necessities of each; (6) health and physical condition; (7) financial circumstances, including time and manner of acquisition of property in question, its value at the time, and its income producing capacity, if any. 368 P.2d at 547 n. 4.

(6) Larry's payments to Carole after separation and his assumption of certain joint debts, totalling $20,177; (7) Carole's quitclaim of the Primrose Street property; (8) Larry's expenditure of $8200 on improvements to the property after the parties' separation; (9) the fact that Larry's earnings were twice as much as Carole's; and (10) the fact that the present value of the Primrose Street property was largely due to an increase in property values.

██ Carole contends that the trial court's property division was clearly unjust because the court either misapplied or ignored certain relevant factors, the court relied on inappropriate factors, and the court erred in its findings regarding debts Larry assumed and payments he made to Carole.

While the trial court need not make findings on all of the *Merrill* factors,[9] the record reflects no determination of the parties' future needs and their respective abilities to meet those needs. Such a determination requires findings on future earning capacity, station in life, financial condition, health and physical condition, and circumstances and necessities of each party. Given that at the time of divorce, Larry was 45 and Carole was 48 a consideration of their respective future needs and abilities is particularly relevant. On remand, we direct the trial court to rectify this inadequacy in the findings. *Compare Brooks v. Brooks,* 677 P.2d 1230, 1233 (Alaska 1984) (similar inadequacies).

██ The trial court found that Larry supported Carole's two children from her previous marriage and one of her grandchildren. Carole argues that the trial court abused its discretion in considering such support in dividing the property. At common law, a stepparent-stepchild rela-

tionship imposes no obligations and confers no benefits on either the stepparent or the child. *Marriage of Dawley,* 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323, 331 (1976); *Harper v. New Mexico Department of Human Services,* 95 N.M. 471, 623 P.2d 985, 987 (1980); *State v. Gillaspie,* 8 Wash.App. 560, 507 P.2d 1223, 1224 (1973); *see also* 4 H. Clark, *The Law of Domestic Relations in the United States* § 6.2, at 188 (1968).[10] Since a stepparent need not support a stepchild, any such support provided must be presumed to be a gift. Generally, interspousal gifts are deemed the separate property of the donee spouse. L. Golden, *Equitable Distribution of Property* § 5.27, at 122 (1983). In Alaska, however, separate property acquired during marriage is subject to division "in the manner as may be just," AS 25.24.160(6). We are unable to say that the division in this case was made unjust by the court's consideration of Larry's contributions to the support of Carole's children.

██ Carole maintains also that the trial court clearly erred in finding that Larry assumed debts and made payments to Carole totalling $20,177. Alaska Civil Rule 52(a). "A finding is clearly erroneous when, although there may be evidence to support it, we are left with the definite and firm conviction on the entire record that a mistake has been committed." *Alaska Foods v. American Manufacturers Mutual Insurance Co.,* 482 P.2d 842, 848 (Alaska 1971) (footnote omitted).

The trial court took its findings directly from Larry's Inventory of Property Interest. The inventory stated:

### Debts Assumed by Larry

| | | |
|---|---|---|
| 1. | Credit Union | $ 2,145 |
| 2. | National Bank of Alaska (Audi) | $10,788 |

---

9. This list of factors is not exhaustive. Nor must the court make findings on all matters as long as the findings are "sufficient to indicate the factual basis for the ultimate conclusion." *Merrill,* 368 P.2d at 548 n. 10; *Brooks v. Brooks,* 677 P.2d 1230, 1233 (Alaska 1984). Findings may also be made on other relevant factors in a particular case. *Wanberg,* 664 P.2d at 575 n. 22.

10. Some states impose responsibilities on the stepparent to support stepchildren as long as the stepparent is married to the child's natural parent. *See, e.g.,* Wash.Rev.Code § 26.16.205 (Supp.1985); *Komm v. Dep't of Social & Health Serv.,* 23 Wash.App. 593, 597 P.2d 1372, 1373 (1979). Alaska, however, imposes no such duty.

| 3. | Bank Americard | $ 2,351 |
| 4. | Sears | $ 576 |
| 5. | Mastercharge | $ 923 |
| 6. | Pay N Save | $ 332 |
| 7. | J.C. Penney's | $ 248 |
| 8. | Allstate Insurance (Audi) | $ 1,000 |
| | | $18,353 |

*Paid to or for Carole after Separation*

| 9. | Sept. 9, 1980 Income Tax Refund | $1,050 |
| 10. | December 7, 1980 | $ 200 |
| 11. | March 26, 1981 | $ 327 |
| 12. | June 23, 1981 (eye glasses) | $ 247 |
| | | $1,824 |

At trial, Carole testified that item #1 was a loan for a Ford pick-up truck that Larry possesses. Item #2 is incorrect, because the bank records reflect that only $3758.30 remained on the debt at the time of trial. Carole could not recall what items #3–7 specifically represented, but she stated that Larry often used these charge cards in the course of his employment and received reimbursement. Item #8 covered insurance for *all* their vehicles, not just Carole's car. Larry did not contradict any of Carole's claims. In fact, Larry agreed that about $13,000 of the debts he assumed were mutual debts. As mutual debts, the entire amount should not be offset against the property distributed to Carole.

Carole testified that item #9 reflects the total income tax refund for 1980, not just Carole's share. Larry acknowledged that this may be true. Carole also claimed that items #10 and #11 are reimbursements for charges made by Larry on gas credit cards. Larry disagreed.

Even relying solely on Larry's testimony, the superior court's findings on this issue were clearly erroneous. At a minimum, a mistake was made regarding the amount still owed to the National Bank of Alaska for the Audi. We direct the trial court to correct these findings on remand so that they clearly reflect the parties' testimony.

The superior court's division of property is REVERSED and the case REMANDED for consideration of the value of the equity accumulated in the Primrose property during the marriage as a marital asset, for corrections in the findings, and for an equitable distribution of the properties based on all relevant *Merrill* factors.