18 P.3d 1210 (2001)
B.B., Appellant,
v.
D.D., Appellee.
No. S-9117.
Supreme Court of Alaska.
March 9, 2001.
B.B., pro se, Kenai.
D.D., pro se, Fairbanks.
Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

OPINION
CARPENETI, Justice.

I. INTRODUCTION

Charlene and Tyler Diller are the children of Becky Bergstrom and Dave Diller.[1] The children are the subjects of this increasingly acrimonious custody dispute. An Oregon court originally granted custody to Bergstrom after the couple's 1991 divorce. The Alaska superior court modified custody to Diller after trial in 1998. Because the superior court had subject matter jurisdiction and did not abuse its discretion in modifying custody to Diller and in denying modification to Bergstrom, we affirm.

II. FACTS AND PROCEEDINGS

Becky Bergstrom and Dave Diller married on March 26, 1984, in Oregon. Their union resulted in the birth of two children: Charlene *1211 and Tyler. Charlene was born in Portland, Oregon, on November 1, 1984; Tyler was born in Fairbanks on February 18, 1986.
Bergstrom alleged that on February 9, 1989, Diller choked and threatened to kill her. After the alleged assault, Bergstrom and the children moved back to Oregon. In November 1990 Bergstrom and Diller divorced. The Oregon court granted Bergstrom "sole and exclusive legal and physical custody" of Charlene and Tyler, then six and four years old, respectively.
In early 1991 Bergstrom, Charlene, and Tyler moved to North Pole. While Bergstrom and the children lived in North Pole, Diller regularly exercised his visitation rights, seeing Charlene and Tyler on weekdays, at least every other weekend, and for extended periods during the summer. Around the end of August 1996, Bergstrom and the children abruptly left North Pole, allegedly eluding an agent sent to repossess Bergstrom's vehicle. Because he lost contact with Bergstrom and the children as a result of Bergstrom's flight with the children, Diller hired a private investigator to locate them.
On November 22, 1996, the private investigator found Bergstrom and the children in Kasilof. They were living in a fourteen-foot trailer apparently without electricity, water, sewer service, or heat. Bergstrom had been home schooling Charlene and Tyler since early October.
In December Diller filed motions asking the court for a modification of the custody arrangement, temporary custody of the children, expedited consideration, and a temporary restraining order barring Bergstrom from leaving Kasilof. Superior Court Judge Harold M. Brown granted the temporary restraining order and expedited consideration. After a hearing on December 9, the superior court granted temporary custody to Diller, but reserved the final decision until custody investigations could be completed. After the oral ruling at the hearing, Bergstrom stated that she would prefer that the children be placed in foster care rather than in Diller's custody.
Judge Brown presided over the hearing to modify custody of Charlene and Tyler in June 1998, and granted legal and primary physical custody to Diller. Judge Brown based his decision on Bergstrom's failure to inform Diller of her new residence after she relocated; Bergstrom's repeated failure to cooperate with the child custody investigation without substantial excuse; Diller's ability and willingness to provide for the children's physical, mental, religious, emotional, and social needs, and Bergstrom's inability and unwillingness to provide for the same; Bergstrom's lack of credibility based on her contradictory testimony and general demeanor; Bergstrom's failure to provide adequately for the needs of the children; and Bergstrom's lack of any attempt to visit Charlene and Tyler while Diller had temporary custody.
Less than a month later, Bergstrom filed a motion to modify custody and for a temporary restraining order, alleging that Diller was abusing Charlene and Tyler. Bergstrom specifically alleged that Diller: "drug [sic] [Charlene] up seven steps by her ponytail and threw her outside"; "beat[ ] her with a heavy steal [sic] shovel"; yanked Tyler by his ears; "inflict[ed] pain by grabbing and squeezing thier [sic] fragile knee caps with extreme strength"; "tickle[d] the children to a point of unbearable pain as he sits on top of them so they can not get free"; "d[u]g into collar bone and inflict severe pain"; and "sqeeze[d] them extremely hard tring [sic] to pop thier [sic] back as he squeezes under their rib cages until it hurts badly." In addition, Bergstrom alleged that Diller's new spouse yelled at Charlene and threatened to kill her guinea pigs. Bergstrom also filed motions for expedited consideration, to clarify visitation, to set a specific time of visitation, and for temporary custody.
Diller moved to restrict Bergstrom's telephone contact with Charlene and Tyler. Based on a nurse practitioner's report of a telephone conversation in which Bergstrom encouraged the children to run away from Diller, Judge Brown ordered that Bergstrom's telephone contact be limited and supervised.
On April 29, 1999, Judge Brown denied Bergstrom's motion to modify custody and other motions. Bergstrom appeals, primarily *1212 contending that the superior court lacked jurisdiction. In addition, Bergstrom's pro se brief appears to argue that the trial court abused its discretion in modifying custody to Diller and in denying her subsequent motion to modify.

III. STANDARD OF REVIEW

We will reverse a trial court's resolution of custody issues only if the record shows that the trial court abused its discretion or made clearly erroneous controlling findings of fact.[2] Subject matter jurisdiction is a question of law that we review de novo.[3]

IV. DISCUSSION

A. The Superior Court Had Subject Matter Jurisdiction to Modify the Oregon Child Custody Order.

Bergstrom argues that the Alaska superior court lacked jurisdiction to modify the Oregon order because the Oregon order was never registered under the Uniform Child Custody Jurisdiction Act. A court's subject matter jurisdiction in a child custody matter is affected by the federal Parental Kidnaping Prevention Act[4] and the state Uniform Child Custody Jurisdiction Act.[5]
Assuming without deciding that the federal Parental Kidnaping Prevention Act applies, we conclude that the superior court satisfied the federal act's requirements. That law generally forbids one state's court from modifying the custody order of another state's court. The one relevant exception allows a court to modify a custody determination of a court of another state if:
(1) it has jurisdiction to make such a child custody determination; and
(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.[6]
Thus, for the Alaska court to have properly exercised jurisdiction under the federal act, it must have had jurisdiction according to Alaska's version of the Custody Jurisdiction Act, and the Oregon court must have lost or declined jurisdiction to modify its initial determination.[7]

1. The Oregon court no longer has jurisdiction.

While no evidence shows that the Oregon court has declined jurisdiction to modify, the Oregon court has lost jurisdiction. Oregon's 1996 version of the Custody Jurisdiction Act generally requires that Oregon be the children's home state (the state where the children lived for six months prior to the initiation of the custody modification proceeding) or that exercising jurisdiction be in the best interest of the children because of some significant connection with Oregon.[8] Neither Diller, nor Bergstrom, nor the children have lived in Oregon since 1991. Thus, Oregon was not the children's home state in 1996, and no significant connection exists between the children and Oregon.

2. The superior court had jurisdiction to modify under Alaska's Uniform Child Custody Jurisdiction Act.

Alaska's Uniform Child Custody Jurisdiction Act required that one of several listed conditions be met before a court has *1213 jurisdiction to modify another state's custody order.[9] Condition (1)(A) required that Alaska be the home state of the children at the time of commencement of the custody modification proceeding.[10] "Home state" meant "the state in which the child, immediately preceding the time involved, lived with the child's parents, a parent, or a person acting as parent, for at least six consecutive months..."[11] Here, the modification proceeding commenced on December 2, 1996, with Diller's motion for modification of custody. By that date, the children had been living with their mother in Alaska for more than five years. Because Charlene and Tyler had lived with Bergstrom in Alaska for more than six months prior to the commencement of the custody proceeding, Alaska was the children's home state at the time of the commencement of the proceeding. Accordingly, the superior court had jurisdiction to hear the child custody matter under the state act.

3. The superior court gave Bergstrom notice and an opportunity to be heard.

Both the federal Parental Kidnaping Prevention Act and Alaska's Uniform Child Custody Jurisdiction Act required that contestants have notice and an opportunity to be heard before a modification of custody.[12] Bergstrom had notice of Diller's motion for temporary custody and motion to modify custody. She argued her case at the hearing to determine temporary custody and at the trial to modify custody. Thus, the trial court satisfied the requirements of both federal and state jurisdictional acts.

B. The Superior Court Did Not Abuse Its Discretion by Modifying Custody.

On June 18, 1998, Judge Brown modified custody from Bergstrom to Diller. To modify a custody order, a court must conclude that a substantial change in circumstances had occurred since the order and that modifying custody is in the best interests of the children.[13] As we noted above, Judge Brown's reasons for finding that it was in the best interests of the children to modify custody included the following: (1) Bergstrom relocated with the children without notifying Diller of their new residence; (2) Bergstrom repeatedly failed to cooperate with the child custody investigation without substantial reason; (3) Diller was able and willing to provide for the physical, mental, emotional, religious, and social needs of the children while Bergstrom was unable and unwilling to do so; (4) Bergstrom was not a credible witness, primarily because of her inconsistent testimony and her demeanor; (5) Bergstrom had failed to provide adequately for the physical needs of the children; and (6) Bergstrom had failed to visit the children while Diller had temporary custody. The conclusions that a substantial change in circumstances had occurred and that granting custody to Diller was in the best interests of the children were adequately supported by the record. Thus, Judge Brown did not abuse his discretion, and we affirm.

C. The Superior Court Did Not Abuse Its Discretion in Denying Bergstrom's Motion for Modification of Custody.

Bergstrom filed a motion for modification of custody and several other motions on July 8, 1998, less than a month after Judge Brown had issued his custody modification ruling after trial. After an evidentiary hearing and substantial motion practice, Judge Brown denied the motions. Because our review of the record reveals no evidence that Judge Brown abused his discretion by denying Bergstrom's *1214 motion to modify custody and other motions, we summarily affirm.
Bergstrom has attempted to supplement the record with evidence of possible domestic violence against Charlene and Tyler that was not presented to the superior court. Matters not made issues or tried before the lower court will not be considered on appeal.[14] We denied the motion to supplement because we cannot properly receive and consider evidence that was not presented to and considered by the trial court.
Bergstrom may present any evidence of possible child abuse to the superior court for evaluation with a new motion for modification of custody. "[A] finding that a crime involving domestic violence has occurred since the last custody or visitation determination is a finding of change of circumstances...."[15]

V. CONCLUSION

Because the superior court properly exercised subject matter jurisdiction and did not abuse its discretion in modifying custody, we AFFIRM.
NOTES
[1] Pseudonyms have been used in this opinion.
[2] See Siekawitch v. Siekawitch, 956 P.2d 447, 449 (Alaska 1998); Gratrix v. Gratrix, 652 P.2d 76, 79-80 (Alaska 1982).
[3] See B.J. v. J.D., 950 P.2d 113, 115 (Alaska 1997).
[4] 28 U.S.C.A. § 1738A (1996) (amended October 28, 2000).
[5] The version applicable to this case is the former AS 25.30.010-25.30.230. That version, known as the Uniform Child Custody Jurisdiction Act, was repealed in 1998 and replaced with the Uniform Child Custody Jurisdiction and Enforcement Act, AS 25.30.300-25.30.390, effective September 23, 1998. See ch. 133 §§ 2 & 4, SLA 1998.
[6] 28 U.S.C.A. § 1738A(f)(1) & (2).
[7] Even though we cannot determine on this record whether the Oregon custody order was made "consistent with the provisions of [the federal act]," 28 U.S.C.A. § 1738A(c), so as to engage the requirements of that act, we proceed as if the federal act does apply. Since the federal act encompasses the state act, a finding that the federal requirements have been met is determinative of the issue.
[8] Or.Rev.Stat. § 109.730 (repealed 1999).
[9] See former AS 25.30.020(a).
[10] Former AS 25.30.020(a)(1)(A) states the relevant requirement for jurisdiction to modify a child custody determination in this case:

(a) The superior court has jurisdiction to make a child custody determination by initial or modification decree if the conditions set out in any of the following paragraphs are met:
(1) this state (A) is the home state of the child at the time of commencement of the proceeding....
[11] Former AS 25.30.900(5).
[12] See 28 U.S.C.A. § 1738A(e); former AS 25.30.030.
[13] See AS 25.20.110.
[14] See Lumbermens Mut. Cas. Co. v. Continental Cas. Co., 387 P.2d 104, 109 (Alaska 1963).
[15] AS 25.20.110(c).